## The Indiana, Illinois and Iowa Railroad Company

*v.*

## Harry Otstot.

*Opinion filed October 24, 1904—Rehearing denied December 8, 1904.*

1. Master and servant—*when question whether section man assumed risk is for the jury.* Whether knowledge by a section man of a hostler's practice of running engines without sounding the whistle or ringing the bell amounts to an assumption of risk is a question for the jury, under evidence that the hostler started the engine without warning within two hundred feet of where the section man was working, who had his back turned to the engine and did not know of its presence in the yards.

2. Same—*hostler and section hand are not necessarily fellow-servants.* A hostler whose duties require him to run engines from the depot to the round-house is not necessarily and as a matter of law a fellow-servant of a section hand employed in the yards, and whose association with the hostler in discharging his duties is accidental, and not habitual.

3. Instructions—*when party cannot complain of refusal of instruction.* A party offering several instructions embodying the same proposition in varying language cannot complain that the one he considers most important was refused, where the others are given.

4. Same—*rule as to instruction for weighing affirmative and negative testimony.* An instruction advising the jury that the testimony of a witness that he heard á locomotive bell ringing is of greater weight than the testimony of a witness that he did not hear it ring must be based upon the hypothesis of equal opportunity.

5. Trial—*when improper statement of counsel will not reverse.* A statement by counsel for plaintiff, in the presence of the jury, to the effect that plaintiff was not going to ask any instructions, while improper will not work reversal, where it was made in response to the court's request to "pass up your instructions and proceed with your arguments."

6. SAME—*sustaining objections to improper remarks does not always purge record of error.* The action of the court in sustaining objections to improper remarks or conduct of counsel will not always be regarded as purging the record of error.

APPEAL, from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of LaSalle county; the Hon. CHARLES BLANCHARD, Judge, presiding.

GLENNON, CARY & WALKER, and REEVES & BOYS, for appellant.

ARTHUR H. SHAY, BROWNE & WILEY, and BREWER & STRAWN, for appellee.

Mr. JUSTICE SCOTT delivered the opinion of the court:

This is an appeal from a judgment of the Appellate Court for the Second District, affirming a judgment of the circuit court of LaSalle county for the sum of $8000, recovered by appellee against appellant for personal injuries.

One terminus of appellant's railroad is at Streator, Illinois, where it has extensive switch yards. Lundy street, in that city, is a street running east and west. North from that street, in the following order and parallel thereto, are Livingston, Wilson, Bridge and Main streets. Between Lundy street and Main street, the main track of appellant runs north and south. This track approaches Lundy street from the south, and, together with all the other tracks of appellant, terminates at or near Main street. The depot is located on Bridge street, about one block south of the terminus of appellant's tracks. About one hundred feet south of Lundy street, a switch leaves the main track on the east side and runs first in a north-easterly direction. As it approaches Main street, however, it gradually turns in a north-westerly direction and again intersects the main track. This switch is known as the lead track. Between this lead track and the main track are five switch tracks, which are parallel with the

main track and connect at both ends with the lead track. Where the lead track leaves the main track south of Lundy street, is switch stand No. 1. Following the lead track northeast, switch stand No. 2 is located, at the intersection of the first switch track with the lead track; switch stand No. 3 at the intersection of the second track; switch stand No. 4, where the accident hereinafter mentioned occurred, at the intersection of switch track No. 3.

Appellee was a section hand, and on the morning of February 7, 1900, at 7:15 o'clock, the section gang, composed of Harry Sawyer, the foreman, and of Mull, Lantzer and appellee, section hands, was proceeding south on a handcar on the main track, for the purpose of going to the roundhouse, which was situated in the yards south of Lundy street, for the purpose of cleaning out the ash-pit. When they got to Lundy street, they found the main track south of them blocked, and the foreman directed them to take the hand-car off the track and clean out the switch points along the lead track. They first commenced work at switch stand No. 2, then moved to No. 3 and then to No. 4. While engaged in throwing out the water that had collected between the rails at switch stand No. 4, Mull and appellee were standing between the rails, facing south. At that time Mumaw, a hostler in the employ of the appellant, backed locomotive engine No. 9 south on switch track No. 4, which is next east of switch track No. 3 and intersects the lead track at switch stand No. 5. The engine followed the switch to the lead track and then came along the lead track until the tender struck appellee, knocking him down. The two rear wheels ran over his left leg, necessitating its amputation, and he was otherwise injured. Mull, one of the other section men, who was working alongside of appellee and facing the same way, was struck and slightly injured at the same time.

Appellee brought suit and filed a declaration consisting of five counts. The first charges negligence in driving the engine along the track. The second charges negligence in

that the hostler failed to ring a bell or sound a whistle to warn appellee of the approach of the engine. The third count charges willful and wanton negligence on the part of the hostler in charge of the engine. The fourth count charges that the defendant failed to furnish a sufficient number of servants to properly operate the engine, and carelessly and negligently placed the same in the care of but one of its servants. The fifth charges that the defendant carelessly and negligently placed the engine in charge of an unskillful and reckless person. The plea was "not guilty."

At the close of the plaintiff's evidence, and again at the close of all the evidence, appellant moved the court to direct a verdict for the defendant. The motion was denied in each instance, and this action of the court is assigned as error, and the question is thereby presented whether there is any evidence in the record which, with the legitimate inferences to be drawn therefrom, is sufficient to warrant a verdict in favor of the plaintiff.

It is first insisted that there is no evidence that appellee was in the exercise of due care for his own personal safety at the time of the accident, and this is based on the fact that he did not keep such a lookout to the north and back of him, at the place where he was working, as would enable him to ascertain that the engine was approaching from that direction. He had been in the employ of the appellant as a section hand for two years. His duties, ordinarily, were confined to the switch yards at Streator, which extended from Main street, where all the tracks terminated, south and east along the main track a distance of two and one-half to three miles. In some emergencies, however, he was sent out to work at places beyond the yards, as the exigencies of the business of appellant required. On the morning in question, engine No. 9 came in with a freight train about 6:45 A. M. It stopped at the round-house, which is about a mile from Main street, for the hostler, and then proceeded north to the depot, which was near Main street. There it was uncoupled and

the hostler took it over on the switch to a place just south of Livingston street, where it was standing prior to the time it was moved south at the time the accident occurred, and it stood there for about a half hour. That place is about one hundred and eighty feet north of switch stand No. 4. When appellee was at work just prior to the accident, there was an engine in the yards south of Lundy street, switching freight cars and using the switch tracks, and the lead track upon which the appellee was at work. Appellee was facing south, and this engine, which was engaged in switching freight cars, was south of him. He testified that he did not know that there was any engine in the yards north of him, and that as he worked he looked around every one or two or three minutes to see whether any engine was approaching from the north, but did not see engine No. 9 or know that it was north of him until it struck him. It is not contended that he was in an improper place or position to do the work which he had been directed to do by his foreman. His attention would naturally be engrossed by his occupation. He knew of the engine working south of him and would be on the alert to avoid any danger from that direction. He did not know of the one north of him. Under these circumstances, we regard the question whether he was in the exercise of due care as one for the jury.

When Mumaw took charge of the engine, he backed it down from Main street on track No. 4 until he crossed Livingston street. There he stopped the engine and waited until the tracks south of him were cleared by the switch engine so that he could reach the round-house. There is evidence that at the time of starting the engine south, after the tracks were cleared, just before the accident, Mumaw knew that these section hands were working on the track at switch stand No. 4, and that he started the engine and ran it over the distance intervening the point at which it had been stopped, just south of Livingston street and the point where it struck the appellee, without ringing the bell or sounding the

whistle or giving other warning of its approach. From this evidence the jury might well infer negligence on the part of the appellant.

Counsel suggest that the injury to appellee resulted from a risk which he had assumed. The evidence tends to show that the proximate cause of the accident was the negligence of the defendant in failing to give appellee warning of the approach of the engine, and it appeared from the testimony of appellee that he had frequently seen Mumaw in charge of a moving engine when the whistle was not sounding and the bell was not ringing, and it is said that by reason of this fact 'and of the further fact that he had not made any complaint of Mumaw's conduct in this regard he had assumed the risk of any injury that he might receive as a result of Mumaw operating an engine without ringing the bell or sounding the whistle. If it be conceded that counsel's view is correct in this respect so far as it might concern appellee if he had come upon the track on which the engine was moving after it was in motion, we are still of opinion that whether or not appellee had assumed the risk resulting from the failure of Mumaw to give notice of the fact that he was about to start an engine standing at a point less than two hundred feet from the place where he knew appellee was working·on the track which the engine would follow when in motion, and from the failure to give warning that the engine was approaching after it was in motion, was a question for the jury. While appellee knew that Mumaw moved the engine through the yards with bell and whistle both silent, we do not think it can be said, as a matter of law, that he thereby assumed the risk that Mumaw would deliberately start an engine and run it upon men who he knew were working on the track at a point not more than two hundred feet from the starting place of the engine, without giving them any warning whatever.

It is next insisted that the evidence in this case is such that all reasonable minds must reach the conclusion that

Mumaw, whose negligence caused the injury, and appellee were fellow-servants. To create that relation between servants they must be directly co-operating with each other in a particular work at the time of the injury or their usual duties must be such as to bring them into such habitual association as will afford them the power and opportunity of exercising an influence, each upon the other, promotive of their mutual safety. (*Chicago and Northwestern Railroad Co.* v. *Moranda,* 93 Ill. 302; *Pagels* v. *Meyer,* 193 id. 172; *Duffy* v. *Kivilin,* 195 id. 630.) It is not claimed that appellee and Mumaw were fellow-servants within the first division of the rule, but it is claimed that their usual duties brought them into such habitual association as afforded them the power and opportunity of exercising an influence over each other promotive of mutual safety. It appears from the evidence of appellee that it was his duty and the duty of the section men with whom he worked to keep the railroad tracks in repair, and that their usual duties included work on all the tracks in the yards at Streator. Mumaw's duties were to take engines from the depot to the round-house when they came in off the road and to fetch them from the round-house to the depot when they were needed to go out on the road. Both appellee and Mumaw worked during daytime. It appears that on several occasions appellee had ridden on an engine with Mumaw on Sunday when appellee went to the round-house to clean out the cinder pit, but that his duties did not require him to ride there, and that he was not directed to ride there by appellant, and that he did it to save walking the distance to the round-house. It also appears that appellee saw Mumaw practically every day; that is, Mumaw would be going back and forth on an engine through the yards while appellee was at work there. Whether they saw each other, however, or came in contact with each other, or whether any of the section men saw Mumaw or came in contact with him, was purely a matter of chance. The duties of the section men never necessarily brought any

of them into association with Mumaw, and his duties did not at any time necessarily bring him into association with any of them. They were employed in different departments, and the work of the section men had no connection whatever with that of the hostler. He might never be brought into association with any of them. Such association as there was between Mumaw and the section men was purely accidental, resulting from the fact that they happened to be working in the part of the yards through which he passed in the performance of his duties in taking engines to and from the round-house at a time when he had occasion to move an engine through that portion of the yards. Under these circumstances, we cannot say that the evidence is such that all reasonable minds must conclude that Mumaw and appellee were fellow-servants.

Appellant requested the court to give to the jury thirty-four instructions, which cover seventeen printed pages of the abstract. These instructions seem more voluminous and numerous than there was occasion for in view of the few and simple issues involved in this cause. The first twenty-two of these were given. The last twelve were refused. The refusal of each of the twelve is assigned as error. No. 23 announced the doctrine of assumed risk. Nos. 17 and 20 "given" correctly laid down the law on this subject, the only difference being that No. 23 points out the duty of an employee who discovers an extraordinary hazard in the service which did not exist, or of which he did not have knowledge, when he entered the service. While this instruction stated the law correctly, we do not regard its refusal as error, in view of the fact that 17 and 20 were given. Had the seventeenth and twentieth not been offered and given, the twenty-third should have been given. Where a party thus offers two or more instructions embodying the same proposition in varying language, he will not be heard to complain because the court refuses the one the party considers most important where the others are given. He can avoid this difficulty by

requesting the giving only of the instruction which is most satisfactory to himself on that subject.

No. 24 is to the effect that if it was the duty of each of the section hands to look out for himself and the other members of the section gang, and to give each other warning of approaching trains or engines, and that if the man Lantzer, who was working with appellee, neglected this duty, then appellee cannot recover. There is no evidence on which to base such an instruction, and it was properly refused.

No. 25 advised the jury not to arrive at a verdict by chance, and in the event of finding a verdict for the plaintiff, not to determine the amount by adding the amount individual jurors think ought to be awarded and dividing the sum so obtained by the number of jurors voting; but these propositions were coupled with an incorrect statement of the law of negligence, and with a misleading statement of the law in reference to the duty of a juror to refrain from consenting to a verdict which does not meet with the approval of his judgment.

The twenty-sixth, twenty-eighth and thirtieth deal with the doctrine of assumed risk, and we regard that subject as having been sufficiently covered by the seventeenth and twentieth instructions.

The thirty-second and thirty-third were in substance that the affirmative testimony of witnesses that they heard a bell ring was of more force as evidence than opposing statements of witnesses of equal credibility that they did not hear the bell ring. In the case at bar, appellant contended that Mumaw started the bell ringing before he moved the engine from the place where he had stopped it, south of Livingston street, and kept it ringing continually until after the accident occurred. A man by the name of Ferriter testified that he was on the engine before it started with Mumaw and continued there with him until after the accident occurred, and that he heard no bell rung or whistle sounded on that engine prior to the accident. Another witness by the name of Pryor

testified that he was on the switch engine which stood on track No. 1, about thirty feet from the point where the accident occurred, which would be about two hundred feet from the place where engine No. 9 stood after being stopped on the south side of Livingston street, and that he heard the bell on engine No. 9 ringing just as that engine started south, immediately before the accident. It is apparent that the rule announced by these last mentioned instructions could not properly be applied to these two witnesses. Where the trial court refused a similar instruction asked by defendant and there was a judgment for the plaintiff, this court declined to reverse the judgment in *Atchison, Topeka and Santa Fe Railroad Co.* v. *Feehan,* 149 Ill. 202, and said: "The force and weight to be given to the testimony of the respective witnesses is a matter to be determined by the jury, and with which the court should not ordinarily interfere." In any event, an instruction which attempts to advise the jury, that in determining whether a bell did ring, the testimony of a witness who testifies affirmatively that a bell was rung is of greater weight than that of a witness who testifies that he did not hear it ring, should be based on the hypothesis of equal opportunity. The instructions before us are defective in this respect.

We have been favored with no statement showing that there was error in the refusal of the twenty-seventh, twenty-ninth, thirty-first and thirty-fourth instructions, and it is therefore unnecessary to discuss them.

At the close of all the evidence, the court, in the presence of the jury, after being advised that the proof was all in, addressing counsel on both sides, said: "Well, pass up your instructions and proceed with your arguments." Thereupon counsel for appellee replied: "We haven't any instructions to pass up, your honor." Counsel for appellant objected to this statement, made in the presence of the jury. Thereupon counsel for appellee responded: "We have a right to tell the jury that we are not going to ask any instructions." Objec-

tion was made to this statement, and the court, after expressing regret that the statement had been made, sustained the objection. Counsel for appellee was mistaken in saying that he had a right to advise the jury that he did not intend to ask any instructions. So far as the jury is concerned, the instructions are the instructions of the court, given as the court's view of the law, and the jury should not be informed at whose request they are given. This court long since condemned the practice which once prevailed of writing the words "plaintiff's" and "defendant's" on the instructions requested by the respective parties. (*Aneals* v. *People,* 134 Ill. 401.) The statement made by counsel for appellee in this case conveyed to the jury precisely the information which this court intended to prevent when it disapproved the practice of so marking instructions. Where the jury are advised that certain instructions are given at the request of one of the parties, there is danger that they will look upon such instructions as in the nature of an argument in favor of the party requesting them instead of an impartial statement of the law. Appellant, however, obtained the only relief it asked, which was that its objection to the statement be sustained. The action of the court in sustaining an objection made to improper remarks or conduct of an attorney in the cause will not always be regarded as purging the record of error. (*West Chicago Street Railroad Co.* v. *Sullivan,* 165 Ill. 302.) In this instance, the statement to which the original objection was made was elicited by the court's request or direction to pass up the instructions, and was directly responsive thereto. We do not consider the objectionable conduct of counsel, under the circumstances here disclosed, such as to warrant a reversal.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*